My name is Tom Barham. I represent Joe Ramirez on this appeal. Mr. Ramirez, as you know, is seeking to have the District Court's Order of Granting Summary Judgment vacated and the matter remanded. We believe that there is sufficient evidence to create triable issues of fact on the detention, the paddown search, the reaching into the pocket, the arrest, the storage of the car, the qualified immunity issue, and municipal liability. Having watched or listened to the arguments that just went on, I know that you all have questions that I think my time would be better spent answering your questions rather than giving a prepared speech. So if you have any specific questions for me, I'll be happy to respond. Was your client charged with anything? No, Your Honor. The District Attorney declined to prosecute. The lab test showed that there was no drugs in his system. He must have been booked on suspicion of something, right? He was booked by Officer Montez for being under the influence of a drug in violation of 11-550 subdivision A of the Health and Safety Code. Which provides what? That if a person is under the influence of one of the scheduled drugs, that a person is therefore guilty of being under, rather, a statutory violation. It's simply being under the influence anywhere? In public or what? Yes, it doesn't even have to be in public, Your Honor. It can be in a private place and a person can be taken out of their private home if they're under the influence of a drug. Be it heroin, PCP, a stimulant, cocaine, methamphetamine, whatever. Gosh, all those people in hospitals who get morphine shots. Well, it's, I think that there's a provision that if it's pursuant, well, I think you have to use common sense. Okay, so this is nothing connected with driving. Well, why didn't, I mean, he finds your client sleeping in the car and he gives himself a rude answer. Yes. Why is that enough? Well, there's more to it than that. What Officer Montez claims is that his suspicion is aroused because he feels that this may be a person who is feigning being asleep because he's going to be involved in a getaway driver for a robbery or that he is part of a grab and run theft of beer. We did discovery on that and there was exactly two petty thefts committed by 17-year-olds who ran away and there were no robberies during the entire time that this man was a police officer. He'd been a police officer for less than a year at the time of the incident. The rude answer certainly is not sufficient grounds for an investigative detention. Officer Montez concedes that the rapid breathing that he claims to have seen under the totality of circumstances did not give him cause to believe that criminality was afoot. And so under Terry, he just simply doesn't meet the standard. You can't have his hypothetical concerns that some crime might be afoot without some sort of objective facts to link this particular man to those hypothetical facts. Unless you just want to believe whatever the officer says, no matter how hypothetical it may be. Well, we don't and in fact we can't. We in fact have to believe your client's story. So I'm not saying I didn't add any of those other things, but there's no dispute that he was or seemed to be asleep. I don't think there's any question about that and I think the officer... If you say yes, it's fine. Yes. And there's no dispute that he gave a rude or testy answer. I think it could be accurately characterized as testy. Okay. And the officer claims, and I don't think that's disputed either, that testiness is evidence, is some evidence of being under the influence of certain drugs. He claims that irritability is a sign of being under the influence of a stimulant drug. Yes. I think for yes, we'll just save you time. Your clock is ticking. Okay. Sure. Caffeine is also. I'm sorry? Caffeine can also cause irritability. No, I understand. I'm just telling you the facts that are not disputed. I'm trying to gather up the facts that are not disputed because I want to then ask you, given the things that are not disputed, why is that enough? All right. Okay, so I think those things are not disputed. I think there's not a dispute about the fact that the officer took the pulse and found it to be fast.  Well, maybe he made a mistake about it, but it doesn't matter. Maybe he was bad at taking the pulse, but there's no dispute that he. Your client isn't saying, you know, I had a, you know, the officer counted 45 beats a minute or 60 beats a minute, and he said it was 120. He's not saying that. He may say that he did a bad job of counting, but good job or bad job, he got an elevated pulse. We don't know what he got, Your Honor. You're not disputing that he got it. We do not dispute that he took his pulse. Okay, so I'm looking at the undisputed fact, that he took his pulse and he got an elevated number. We don't know that. Have you disputed it? It's as though we have disputed many things that this man said. We know that he lied on certain things that are demonstrable. So to acknowledge that he got an accurate elevated pulse rate, we simply don't know. I'm not saying it was accurate. Are you disputing that when he wrote down whatever number he wrote down, that's the number he thought he got? We do dispute that he accurately wrote down what he got. You keep slipping that word accurately in there. It's kind of jurisdictional. If you want to spend your time rambling about this stuff, that's fine. I don't mean to parry with you, Your Honor. I apologize. Look, if he thinks he got a number, okay, whether he's right or wrong about that, if he's bad at it, the point is he acts on the information. People make mistakes all the time. Yes. It's very different if he gets 60 and he writes down 120. You understand that difference? Yes. You're not claiming the latter, right? You're claiming he's bad at taking the pulse. You're not claiming that he wrote down the wrong number. I don't know what he wrote down. He took his pulse. He says that it was 132. We have no way of disproving that. You haven't disputed it? We dispute that, yes. What have you done to dispute it? During the second deposition of Officer Montez, I had my client wear a heart monitor. We had him take his pulse at that time, and he was off by I think it was 12 beats. He had 126 and it was 116. Pretty close, actually. Anyway, so you say he made a mistake as to that. You're not saying he lied. And then he gave him this test where you're supposed to figure out how long 30 seconds is, right? And your client took significantly longer than that. 45 seconds. It's a Romberg test run. Romberg, that's what it is. I knew it was wrong. One of those European names. Why is that enough? He doesn't have to be sure. He has to have probable cause. Well, yes, he has to have probable cause to believe that the man is under the influence of a controlled substance. And here we don't believe that that was sufficient. There are other signs that are necessary for him to confirm. He claims initially that he saw his pupils. We claim that he didn't. Mr. Ramirez, my client, says that he actually held a pupilometer up to his eyes out in the field and that we don't know what he got, but we know it's not in his report. We know that Montez denies doing that. We know that when Montez got him to the station, he contends that when he did the pupil test in light, that Ramirez's eyes were within normal limits. And the reason he had to do that, obviously, is because you get the booking photograph later that doesn't show what he's claiming in his reports. So we believe the man is a fabricator. We've listed about 12. It's certainly possible to have diarrheal pupils at the time of arrest and not still have them dilated at the time of booking. I mean, we don't know how long. I mean, booking takes some time. The man was in custody a total of two hours and 48 minutes, Your Honor, from the time this man contacted him until he was released from custody. Is there any medical testimony in the record with regard to dilating eyes and what causes it? There's speculation on everybody's part other than what was written down. Is that right? Your Honor, and the DRE manual itself shows that on these stimulant drugs, they're wrong 66% of the time. This thing couldn't pass a Dalbert test in a million years. Well, the probable cause standard doesn't require anything perfect. We're just trying to figure out where this fits. Oh, yeah, I appreciate that, Your Honor. And I read a recent opinion that—or not a recent opinion, but an opinion you did on an L.A. County case of a stop on a car, and you're talking about, well, the officer thought they had guns, and they're pursuing that reason. Well, here he supposedly is thinking that he's involved in a robbery or something. He does nothing to pursue that. He doesn't call for backup. He doesn't do anything to show that he is legitimately concerned that this guy is involved as a lookout for a robbery. He doesn't call for backup for 10 minutes after the incident. He's a single officer? He's a single officer. He didn't have a partner in the car or nearby or anything else? No. Odom and Harney, you're at? A motorcycle guy or a— No, it's a patrol car, Your Honor. It's a rainy night in May, and he's got rain gear on. He's by himself. I have a minute left, and— Actually, your minute is over. Oh, my goodness. That's why I'm here. Okay. Well, thank you. Good morning, Your Honor. Mitchell Abbott, Richards Watson-Gershon for the Apelli City of Buena Park et al. The question which the Court has inquired, I think, is the alpha and the omega of the case. That is, why isn't this enough? Let me start from the beginning, because you've got to have reasonable suspicion to get him out of the car before you even get to where colleagues were talking about with counsel. So if I understand it correctly, the district court, at least, thought that Montez thought that Ramirez was sleeping. He, at some point, saw him breathing rapidly, and Ramirez asked him if it were necessary to knock on the window to wake him up. Right. Which we can agree was perhaps testy, but not uncooperative. It is what it is. Well, it is what it is, and to me, it doesn't add up to very much. So, I mean, it's – and I'm not trying to peel the artichoke here by saying it's okay to sleep in a car, isn't it? I mean, it is. There's nothing illegal or suspicious intrinsically about taking a nap in a car in a big public parking lot, right? I mean, he could have been waiting for his wife to do the groceries, and he was bored to tears and took a nap. I mean, there are all sorts of things. The time of day would obviously be one of the factors that you would evaluate. Okay. So, you add up he was sleeping, and at some point saw him breathing rapidly, and he was testy. Now, tell me what that adds up to in your judgment. The district court recognized that the case was bristling with disputes about what the actual facts were. Well, yes, but that doesn't – I mean, if you're going to defend a summary judgment, you've got to assume the facts in Ramirez's favor. And actually, I didn't quite do that faithfully, because if I had, what I would have said is Montez saw Ramirez was sleeping and saw him breathing heavily after waking him up, and he was testy. So, what does that add up to? What the court said is that those undisputed facts are enough that a reasonable officer could conclude. I know that's what the district court found. We've now got to say, was that enough? Hence, my question to you, which was, in your judgment, why does that add up? It's what I just said, add up to reasonable suspicion to get the guy out of the car and pat him down. Different from the question about whether he later then managed to accumulate enough to arrest him. We don't have a videotape behind every… It doesn't matter what we don't have. What we do have is Montez thought that Ramirez was sleeping at some point, which in his favor is after he woke him up, he was breathing heavily, and he was testy. If I may add one more fact to Judge Ramos' question, since you had a chance to answer her question as she's phrased it twice, let me just add one more fact, and that is, which I think is consistent, which he then says, and then the officer says, okay, we were going to do it the easy way, but now we're going to do it the hard way, so I'm going to get you out of the car just to show you a hard time. Now, I've changed the statement a little bit, but that was the implication, if you read Mr. Ramirez's allegation of what the officer said. So you have those four facts, including the last one, that we have an explanation from the officer's own mouth that he's doing this for non-legitimate reasons. How can we possibly sustain somebody's judgment? Let's begin with the fact that he's sleeping in the car. Buena Park police officer sees someone asleep in the car. Where was the car? Is the position of the car of any moment? The car was in the parking lot 50 yards from the entrance to the all-night drugstore. Well, 50 yards is in dispute, too, but never mind that. I'm sorry. The parking lights were on, according to his declaration, Montez. What does that have to do with anything? I mean, is the position of the car and all that relative? Can the cop just come into the parking lot and say, well, there's a car over there, I'm going to go over and knock on the window? No, and he said that he pulled up behind the car and didn't flash the lights. But that presupposes you've got a right to go behind the car. How do we start this analysis? As Judge Reimer said, if he pulls a car up, you're way beyond the point where he pulls a car up behind the other car, you're there. How does he ever get to get his car up behind this car to make the next motion? I'm not sure the record tells us what caused him to pull into the parking lot and look at that car. I do know this, that, I don't know, maybe he was going into the Rite Aid to get a donut. But he's walking and he observes. I'm a little frustrated here because we're not doing I don't know. What we're doing is we have a police officer in the middle of the night pulling up behind this car that's parked in a parking lot. Now, we're here to determine whether there's probable cause to go forward. We haven't even gotten to the point where we understand whether he could even park behind the car. And you haven't given me anything so far. I've been kind of following you so far, but you're losing me now because apparently, from what I could tell, the police officer just decided to pull up behind this car and start something, period. I don't know what the... Was this a public lot? Yes. A sale on lot. A sale on lot. Or something like that. It's privately owned, but it's open to the public. It's a drugstore lot or grocery store lot, wasn't it? Right. And I get police cars occasionally pull in and patrol around, right? What I wanted to do was to answer the question that Judge Reimer posed a moment ago, and that is, why is that enough? And I was trying to say, the police officer sees someone who's asleep, maybe unconscious, maybe having a stroke, maybe having a heart attack, and he says, well, there's not really enough there. I'm going to ignore it and walk away. The guy is having a stroke and sues the city for failing to take reasonable steps. I think it was sufficient to see that the guy was asleep, to see while he was in the car that he was breathing rapidly, and that is undisputed. It's a matter of just basic common sense. If I understand it right, Montez also was wearing a baseball cap. So this guy pulls over to sleep in a Savon or whatever parking lot, and the next thing he knows consciously is somebody banging on the window in a baseball cap. If you had been sound asleep in a deep sleep for a few minutes, wouldn't your heart rate go skyrocketing at night if somebody in a baseball cap was pounding on your window? So what does that tell you about whether he's done something illegal? And then he had an irritable and testy response. Who wouldn't? I mean, what's suspicious about that? It's not as if he said, you know, bug off or get out of my face or whatever. I mean, he just said, you have to rap on the window that hard. I mean, we're giving you a lot to say that was testy. It wasn't genteel, perhaps, or just didn't say, oh, geez, great to see you. Well, what is suspicious about it? The three things. Still, you haven't given me an answer. I don't know. According to the – I'm sorry. No, I'd just like to know what it adds up to in your book. According to the police officer's training, these were indications that could indicate being under the influence of a controlled substance. Okay. And the importance of the doctrine of qualified immunity, which is what the case the district court based its decision on, the district court didn't find that there are no factual disputes here. What he found was, based upon the facts which are undisputed, there is enough to clothe this officer with qualified immunity. And that's all we think the court needs to get to. Including his statement that Judge Kuczynski paraphrased. I mean, we've got law out there that says if you've said something like that, you can infer an illegitimate motive behind a retaliatory motive for going forward. I mean, wouldn't a reasonable police officer know that? You can't have qualified immunity when the officer makes a statement of evidence of bad faith. Now, I know it's disputed. I assume it's disputed. Obviously, we have to take it as given. But how can you have qualified immunity when he himself says, okay, well, I'm going to do it the hard way now? I believe that the district court's analysis was, we take a look. We don't look at the officer's motivation. We look at the undisputed facts and try to determine whether those were enough that an objective, reasonable officer would have felt he had a basis for proceeding. And if so, his motivations don't matter. If so, if he had reasonable probable cause, if he had a reasonable articulable belief or suspicion that there was a crime being committed or criminal activity going on, then he qualifies for qualified immunity, even if he later turns out to be wrong. And even if he is, in fact, not acting out of good faith. Right. It's not subjective. It's of an objective belief. The question of whether he enjoys qualified immunity is, I believe, determined objectively and based on the undisputed facts. I think that's right. Okay, thank you. Are there any other questions? I think we've got a case. Thank you, Your Honor. You should take a minute for rebuttal. Very quickly, Your Honor. People often lose ground on rebuttal. I'm sorry? People often lose ground on rebuttal. Go ahead. I will not shoot a horse that's down, Your Honor. I've got that message from just on the circuit long ago. Page 560 of the excerpt of record has a photograph that shows the actual scene at the Rite Aid and it shows where his car was parked. It was not parked 50 yards away. That was another canard that Officer Montez came up with. 560? 560, Your Honor. It's in Volume 2. Wow. How about the photograph? This all corresponds or it follows the declaration of my client, which is fairly comprehensive. The last thing I would add, Your Honor, is a I hope it's not seen as trying to nuzzle up to you, Judge Kuczynski, but your decision in Scott v. Heinrich in 1994 has something in it that I think is pertinent. Courts must carefully examine all evidence in the record, such as medical reports, contemporary news statements by the officer, and available physical evidence, as well as any expert testimony pro-authored by the plaintiff to determine whether the officer's story is internally consistent with other facts. And then you go on to say something that 1990, that was such a long time ago. Most people in the courts were wearing them diapers. That case gave me fits for years. But you concluded, page 915, of that saying In other words, the court may not simply accept what may be self-serving accounts by a police officer. It must look at all circumstantial evidence that, if believed, would tend to discredit the police officer's story and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably. We pro-authored a great deal of testimony, or rather evidence, from Dr. Thomas Streed, our police practices expert, which is found in Volume 3, pages 619 through 641. Okay. Thank you. Thank you, counsel. Thank you for your testimony. We'll next hear Jordison v. Gonzalez. Yeah, definitely. Sure. And, Jordison, I think what we'd like to do is hear from the government first. In an unusual order. You can settle yourself in. But I think it makes more sense, since we had a recent concession from the government. And you're the government.
judges: Brunetti, Kozinski, Rymer